**J.L.L. and S.K.L., Appellants–Defendants,**

v.

**MADISON COUNTY DEPARTMENT OF PUBLIC WELFARE,**
**Appellee–Plaintiff.**

No. 48A02–9308–JV–439.

Court of Appeals of Indiana,
Third District.

Jan. 31, 1994.

Geoffrey B. Yelton, Anderson, for appellants-defendants.

Thomas L. Hulse, Miller, Hulse, Lacey, Hardacre, Austin & Shine, P.C., Anderson, for appellee-plaintiff.

HOFFMAN, Judge.

Appellant-defendants J.L.L. (father) and S.K.L. (mother) (collectively "parents") appeal from the judgment of the Madison Superior Court Division Two which terminated their parental rights with regard to their two children: K.L., born on January 28, 1987, and J.L., born on July 31, 1988 (collectively "children").

The facts relevant to this appeal disclose that in March of 1989, the Madison County Department of Public Welfare (DPW) became involved with the parents due to problems with the care and safety of their two children, specifically, filthy home conditions and child neglect. DPW and the parents entered into an informal adjustment addressing the above-mentioned problems. For approximately one year, DPW supervised the parents' efforts to care for their children. However, in September of 1990, DPW found there to be no improvement in either the parents' parenting skills or their living conditions. DPW removed the children.

It placed them in foster care and initiated a Child in Need of Services (CHINS) proceeding. Although the court adjudged both children to be in need of services, following another period of supervision, the proceedings were eventually dismissed.

In October of 1991, DPW caseworker Nellie Elsten made a follow-up visit. As on prior occasions, she discovered the childrens' environment to be unfit for human habitation. Elsten told S.K.L. to clean up the house immediately. Elsten also informed S.K.L. that if there was no improvement by the next visit, she would remove the children.

When Elsten returned several days later, the conditions were unchanged. The children were filthy. Moreover, Elsten noticed that both were extremely small in stature. She described them as appearing more like two-year-old twins than their respective ages, three and four. Both were nursing on a shared dirty baby bottle containing a "white and brown chunky liquid" which S.K.L. explained was hot chocolate. Elsten also discovered that the children had been sleeping on mattresses on the floor covered by a blanket. These beds were urine soaked and extremely soiled. The food in the refrigerator, spoiled, was unfit for human consumption. She noticed decayed food had been thrown on the water-slick kitchen floor. In the bedrooms were piles of trash. Also, piles of dirty clothing were scattered throughout the house. The house itself reeked of rotting food. Additionally, broken objects, beer bottles, metal and glass were found lying around in the yard and in the living areas of the home.

Elsten again removed the children. This time she took them to the hospital for a medical exam. The exam uncovered that both were infested with head lice. Also, K.L. had vulvar dermatitis, a severe rash in her vaginal area.

DPW placed the children in foster care and in November of 1991, it initiated further CHINS proceedings. On May 28, 1992, after conducting a fact-finding hearing, the court entered a dispositional decree. As part of the decree, the court ordered that the children remain in foster care. It also adopted a Program of Parental Participation (PPP) for both parents to follow. The relevant portions of the PPP were that:

"[3] A. All family members shall have complete evaluations. Vocational Rehabilitation will evaluate the parents and public schools will evaluate [K.L.] and [J.L.].

B. [J.L.L.] shall have substance abuse and anger control evaluation at Center for Mental Health.

C. Both parents shall have basic child care classes at Center for Mental Health.

D. Both parents shall have basic living skills education at Center for Mental Health if recommended.

E. The parents shall obtain their own residence and maintain it within the standards of decency and health.

F. The parents and children shall have regular supervised visits.

G. The parent(s) shall be required to demonstrate [they have] improved [their] ability to fulfill [their] parental obligations in the problem areas identified in the case plan and/or predispositional report."

From the time the PPP was ordered until the date of the final termination hearing, Elsten and other social workers supervised the parents' efforts to comply with the PPP. However, after a period of supervision, DPW concluded that the parents had made no reasonable efforts to comply with the court order.

Consequently, on January 11, 1993, DPW filed a petition to terminate both their parental rights. After hearing testimony by various witnesses including Elsten and the parents, the court entered an order terminating both J.L.L. and S.K.L.'s parental rights. This appeal ensued.

The parents raise two issues on appeal. As restated, they are:

(1) whether the trial court erred by failing to enter special findings of fact pursuant to Indiana Trial Rule 52(A); and

(2) whether there was sufficient evidence to terminate their parental rights.

■ T.R. 52(A) provides that a court shall enter special findings of fact and conclusions of law in two instances: (1) upon a written motion by either party or (2) upon the court's "own motion." T.R. 52(A). When the request for special findings is made by a party, a written motion must be filed with the court prior to the admission of the evidence. See E.W.R. v. T.L.C. (1988), Ind.App., 528 N.E.2d 106, 108, trans. denied (court's failure to make special findings after oral request by party did not constitute error in that T.R. 52(A) is not triggered by oral motion of a party). On the other hand, when the court enters special findings of fact on its "own motion," it need not do so before the admission of evidence but rather at any time before entering the judgment. See T.R. 52(A).

■ Here, because neither party made a written request for special findings at any time prior to the admission of evidence, for a review under the T.R. 52(A) standard, the court must have made special findings upon its "own motion." However, the trial court's order directed the State to "[p]repare proposed [f]indings, [c]onclusions, and [d]ecree with [j]udgment to be as per written [d]ecree." This was merely a provision of the court's order after entry of a general judgment. It did not amount to the court's "own motion" under T.R. 52(A). Accordingly, the parents' argument that the court committed error by not entering special findings is meritless. T.R. 52(A) being inapplicable, we will review the decision of the trial court under the general judgment rule affirming upon any legal theory supported by the evidence introduced at trial. Pierce v. Drees (1993), Ind.App., 607 N.E.2d 726, 728.

Next, J.L.L. and S.K.L. complain that there was insufficient evidence to terminate their parental rights. The focus of their appeal is on only one element, IND.CODE § 31–6–5–4(c)(2)(A); they claim the State

failed to prove by clear and convincing evidence "the conditions that resulted in [their children's] removal will not be remedied."

The purpose of terminating parental rights is not to punish parents but to protect their children. *Egly v. Blackford County DPW* (1992), Ind., 592 N.E.2d 1232, 1234. Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parties are unable to or unwilling to meet their responsibilities as parents. *Id.* This includes situations not only where the child is in immediate danger of losing his life, but also where the child's emotional and physical development are threatened. *Id.*

When reviewing a termination of parental rights, this Court will neither reweigh the evidence nor judge the credibility of the witnesses; we will consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* at 1235. To determine whether there is a reasonable probability that the condition which resulted in the removal of the child from the parent will not be remedied, the trial court must judge the parents' fitness to care for the child as of the time of the termination hearing and take into account any evidence of changed conditions. *Odom v. Allen County DPW* (1991), Ind.App., 582 N.E.2d 393, 395. It must also evaluate the parents' patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

At the hearing, Elsten testified that at no point would she have recommended that the children be returned to their parents. Elsten stated that S.K.L. has an I.Q. of 68, is mildly retarded and very angry. She lacks the ability to focus her attention for any period of time, has problems with basic communication, and acts belligerently towards anyone attempting to help her. Elsten and Susan Jameson, S.K.L.'s therapist, agreed that S.K.L. is both unwilling and incapable of caring for her children or receiving the necessary treatment to help her do so. Jameson explained that S.K.L. suffers from "personality disorder and arrest" a condition, distinguishable from mental retardation, which is characterized by a strong dependency need,

passive aggressive and excessively compulsive tendencies, all characteristics which S.K.L. exhibits. Also, Jameson stated that due to her refusal to cooperate, S.K.L. had not received any treatment for her disorder.

Although Elsten repeatedly informed the parents of the necessity of complying with the court order to the return of their children and DPW took steps to help the parents in attempting to comply with the order, neither S.K.L. or J.L.L. successfully completed their vocational evaluations or the recommended treatments.

J.L.L., like S.K.L., was described as being very angry and uncooperative. Although J.L.L. did undergo an anger control evaluation, he did not follow through with the recommended therapy of participating in a drug and alcohol abuse treatment program. S.K.L. repeatedly cancelled appointments or made no effort to attend scheduled sessions with Jameson so she was also eventually withdrawn from therapy.

Although S.K.L. did attend a parenting program, she refused to attend a living skills program as required by the PPP. J.L.L. attended only one parenting class.

Moreover, although under the PPP the parents were to have regular (weekly) supervised visits with their children, they did not do so. Between February of 1992 and the date of the hearing on March 23, 1993, the children saw their parents a total of nineteen times. S.K.L.'s last visit occurred on February 13, 1993, the first time in sixteen weeks. J.L.L. had not visited his children since November of 1992.

Both S.K.L. and J.L.L. had excuses for not visiting their children, and J.L.L. blamed his failure on the "aggravation" he felt concerning the discipline of his children by their maternal grandmother. The maternal grandmother described the children as being violent and nervous during visits with their parents. She stated the children kicked their parents, threw things or pulled their parents' hair when either S.K.L. or J.L.L. attempted to play with them. She said both children calmed down after their parents left.

Under the PPP, they were to prove that they could maintain their home under normal standards of decency. Although Elsten testified that there was a point in which the parents "did not do a bad job of cleaning," any progress was short-lived. In the months preceding the termination hearing, the parents refused to even allow Elsten access to the home. However, from the stench of rotting food noticeable from outside the doorway, Elsten determined that there had been no substantial change in this area as well.

The court-ordered evaluations uncovered developmental delays in both children. Neither could understand or speak clearly. Being only able to speak in phrases rather than sentences, both childrens' speech patterns were characteristic of two year olds rather than children three and four years old. Also, tests normally performed on children their own ages could not be performed on them because they did not understand what the examiner was trying to do. However, almost immediately upon removal, the children began improvement. Although in need of continuous treatment, both were described at the hearing by Elsten as beginning to grow physically and to catch up to other children their ages in their mental development.

A review of the record discloses that DPW's efforts to help both parents in improving their parenting and living skills have been futile. Although the parents claim they have demonstrated that they are capable of change, it is apparent that they are, in fact, unwilling to do so. The trial court need not wait until the children are irreversibly harmed such that their physical, mental and social development is permanently impaired before terminating the parent-child relationship. *Matter of Adoption of D.V.H.* (1992), Ind.App., 604 N.E.2d 634, 638, *trans. denied.* The above evidence reveals that there has been no improvement in the patterns of conduct of either parent and there exists a substantial probability of future neglect or deprivation if the children are returned to them. As such, we hold that there was clear and convincing evidence that the conditions which resulted in the childrens' removal will not be remedied. There being no error, the order

terminating the parental rights of J.L.L. and S.K.L. is affirmed.

Affirmed.

STATON and RILEY, JJ., concur.