In re The Matter of the Termination of the Parent–Child Relationship of C.M., Minor Child, and Nancy McKinney, Natural Mother.

**Nancy McKINNEY, Appellant–Respondent,**

v.

**GREENE COUNTY OFFICE OF FAMILY AND CHILDREN, Appellee–Petitioner.**

No. 28A05–9608–JV–342.

Court of Appeals of Indiana.

Jan. 29, 1997.

Robert C. Price, Price & Runnells, Bloomington, for Appellant–Respondent.

Bret D. Raper, James J. Riester, Riester & Strueh, Bloomfield, for Appellee–Petitioner.

## OPINION

BAKER, Judge.

Nancy McKinney appeals the trial court's termination of her parental rights. She presents several issues for our review, which we consolidate and restate as whether the evidence was sufficient to support the termination of her parental rights.

### FACTS

On May 23, 1987, McKinney gave birth to C.M. In September of 1989, C.M. was accidentally shot by his older brother, N.M. As a result of the accident, C.M. is a paraplegic and needs breathing treatments, medication and physical therapy.

On April 21, 1994, the Greene County Office of Family and Children (OFC) filed a petition alleging that C.M. was a child in need of services (CHINS). In the petition, the OFC alleged that:

A. [C.M.] is six (6) years of age and confined to a wheelchair because of paralysis from the waist down.

B. [C.M.] cannot care for himself without assistance, including leaving the house in case of emergency.

C. [C.M.'s] Mother left him unattended from at least two o'clock P.M. to seven o'clock P.M. on April 19, 1994.

D. [C.M.] states that his mother leaves him unattended frequently.

E. [C.M.] states that he needs breathing treatments, physical therapy and medication which his Mother does not provide for him.

F. [C.M.'s] mother fails to see that he attends school regularly.

Record at 116. McKinney later filed a written admission to these allegations.

Shortly after the OFC filed this petition, it filed a similar petition for N.M. N.M. was subsequently adjudicated a CHINS and placed in a juvenile facility. In November of 1994, McKinney helped N.M. run away from the juvenile home. McKinney then brought N.M. with her when she committed Residential Entry,[1] a Class D felony, for which she spent ninety days in jail.

After a hearing in January of 1995, the trial court found C.M. to be a CHINS and entered a dispositional order. This order detailed McKinney's responsibilities with respect to C.M.'s care and required her to participate in C.M.'s physical therapy and engage in supervised visitation with him. Additionally, the trial court ordered McKinney to participate in individual therapy.

On December 1, 1995, the OFC filed a Petition for Involuntary Termination of Parental Rights. The trial court conducted an evidentiary hearing on the petition on April 30, 1996. During the hearing, McKinney claimed that the allegations in the CHINS petition were not true and that she had signed the written admission to the allegations because her attorney told her that it

1. IND.CODE § 35–43–2–1.5.

was the only way C.M. could receive government services. On May 20, 1996, the trial court terminated McKinney's parental rights with respect to C.M. McKinney now appeals the termination. Additional facts will be supplied as necessary.

### DISCUSSION AND DECISION

McKinney does not specifically challenge any of the elements the OFC is required to prove to effectuate a termination, but rather claims that the OFC failed to prove the necessary elements by clear and convincing evidence. In particular, McKinney contends that the trial court improperly relied on her admission to the allegations in the CHINS petition, which she repudiated during the termination proceedings, as the sole evidence to support the termination:

> As a result of what happened in this case, there was no reliable evidence showing in a clear and convincing fashion that the requirements of the statute were met.... The only evidence that was presented by OFC that [McKinney] did not provide an adequate home while [C.M.] was in her custody was a repudiated admission of allegations in a CHINS petition.

Appellant's Brief at 14–15. McKinney also argues that at the time of the termination hearing she had taken sufficient steps to improve her care of C.M. and, as a result, prevent the termination of her parental rights.

In response, the OFC argues that this court need not address the issue of whether the trial court properly considered McKinney's admission of the allegations in the CHINS petition because McKinney is barred by the doctrine of collateral estoppel from relitigating the facts admitted in the CHINS petition as to C.M.'s neglect. Additionally, the OFC argues that the record sufficiently supports the trial court's termination of McKinney's parental rights.

### I. Collateral Estoppel

■ Initially, we address the OFC's argument that McKinney was barred during the termination proceedings from relitigating the issues of admission and neglect from the CHINS proceedings. Collateral estoppel operates to bar relitigation of an issue which was necessarily adjudicated in a former suit. *Sullivan v. American Casualty Co.*, 605 N.E.2d 134, 137 (Ind.1992). Where a party seeks to relitigate an issue, the first adjudication is conclusive even if the second action is on a different claim. *Id.*

■ In determining whether to apply the doctrine of collateral estoppel, Indiana courts have traditionally examined whether the party seeking estoppel established the following elements: (1) a final judgment in a former suit on the merits in a court of competent jurisdiction; (2) an identity of issues; and (3) the party to be estopped was a party in the prior action or in privity with that party. *Bojrab v. John Carr Agency*, 597 N.E.2d 376, 379 (Ind.Ct.App.1992). However, the primary consideration in determining the appropriateness of allowing a party to assert collateral estoppel is whether the party against whom the judgment is pled had a full and fair opportunity to litigate the issue in a previous action and whether it would be otherwise unfair under the circumstances of the particular case to apply collateral estoppel. *Tofany v. NBS Imaging Systems, Inc.*, 616 N.E.2d 1034, 1037–38 (1993). To make this determination, our courts consider the party's incentive and ability to litigate the prior action, including the interest at stake for the party in the previous proceeding and how the party perceived this interest. *Id.* at 1038.

To support its position that McKinney is collaterally estopped from challenging her admissions in the CHINS petition, the OFC cites *Adams v. Marion County Office of Family and Children*, 659 N.E.2d 202 (Ind. Ct.App.1995). In *Adams*, this court held that collateral estoppel applied to prevent a father from arguing, during a termination hearing, that he had not sexually abused his daughter where he had previously contested the sexual abuse allegations in an earlier CHINS proceeding. *Id.* at 206. In reaching our decision, we relied on the fact that the traditional elements of collateral estoppel— identity of issues, identity of parties and finality of judgment—had been met. *Id.* at 205–06. However, in light of the test enunci-

ated in *Tofany*, 616 N.E.2d at 1038, which focuses on the parties' interest and motivation in litigating the prior proceeding, we find the rationale employed in *Adams* unpersuasive.

▪ In the context of the parent-child relationship, the parent's interest in litigating a CHINS petition significantly differs from his or her interest in preventing the termination of parental rights. The result of a CHINS proceeding is temporary in nature and enables the parent and child to receive government services, with the ultimate goal of reunification of the parent and child. In contrast, the termination of parental rights is a permanent condition, completely severing the parent-child relationship.

▪ Similarly, a parent's perception of his or her interest in each proceeding may significantly differ. Here, McKinney testified that she signed the written admission to the allegations in the CHINS petition because she thought it was the only way for her child to receive government benefits. Obviously, McKinney was less likely to make such admissions when the termination of her parental rights were at stake.

▪ Finally, the application of collateral estoppel in this situation would not serve the interests of judicial economy. Preventing parents from contesting allegations in a CHINS petition in a subsequent termination action effectively requires parents to become deeply entrenched in a CHINS proceeding in order to protect their rights in a latter termination action, delaying the provision of services to a needy child. Rather than promoting judicial economy, the application of collateral estoppel in this context embroils trial courts in longer, more complicated CHINS proceedings. Given the differences in the nature and consequences of the two proceedings, collateral estoppel in this context is inappropriate. Therefore, McKinney was not estopped from challenging her admissions to the allegations in the CHINS petition during the termination hearing.

▪ Nevertheless, we note that McKinney's admissions were admissible to support the termination of her parental rights. However, collateral estoppel did not prevent McKinney from presenting evidence during the termination hearing to refute her prior admissions.

## II. Sufficiency of Evidence

▪ Next, we must consider whether the OFC presented sufficient evidence to support the termination of McKinney's parental rights. Initially, we note our standard of review. Here, the record reveals that the trial court entered specific findings and conclusions on its own motion. As a result, the specific findings control only as to the issues they cover, and the general judgment controls as to the issues upon which the court has not made findings. *Wagner v. Grant County Dept. of Public Welfare*, 653 N.E.2d 531, 532 (Ind.Ct.App.1995). The specific findings will not be set aside unless they are clearly erroneous and we will affirm the general judgment on any legal theory supported by the evidence. *Id.* A finding is clearly erroneous when there are no facts or inferences drawn therefrom which support it. *In the Matter of M.B.*, 666 N.E.2d 73, 76 (Ind. Ct.App.1996), *trans. denied.* In reviewing the trial court's findings, we neither reweigh the evidence nor judge the credibility of the witnesses. *Wardship of J.C. D.D. v. Allen County Office of Family and Children*, 646 N.E.2d 693, 694 (Ind.Ct.App.1995), *trans. denied.* Rather, we consider only the evidence and reasonable inferences drawn therefrom which support the verdict. *Id.*

▪ To effect the involuntary termination of a parent-child relationship, the OFC must establish the following elements by clear and convincing evidence:

(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that:

(A) the conditions that resulted in the child's removal or the reasons for the placement outside the parent's home will not be remedied; or

(B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31–6–5–4(c). In evaluating the circumstances surrounding the termination, the trial court must subordinate the interests of the parents to those of the child. *R.G. v. Marion County,* 647 N.E.2d 326, 328 (Ind.Ct.App.1995), *trans. denied.* Termination of parental rights is proper when the child's emotional and physical development is threatened. *Id.* While the trial court should judge the parent's fitness at the time of the termination hearing, it must also evaluate the parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect of the children. *J.K.C. v. Fountain County Dep't of Public Welfare,* 470 N.E.2d 88, 92 (Ind.Ct.App.1984). The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship. *J.L.L. v. Madison County Dep't of Public Welfare,* 628 N.E.2d 1223, 1227 (Ind.Ct.App.1994).

### A. Removal From Parent

■ The first requirement under the termination statute is that the child must have been removed from the parent for at least six (6) months under a dispositional decree. I.C. § 31–6–5–4(c). In this case, the record reveals that C.M. was placed in foster care pursuant to the dispositional order on January 6, 1995. C.M. continued to live outside McKinney's home at the time of the termination hearing on April 30, 1996. As a result, C.M. had been removed from the home for far longer than the statutorily required six months.

### B. Conditions Resulting in Removal From Home

Next, the OFC must prove that a reasonable probability exists that the conditions that resulted in the child's removal from the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of the child. I.C. § 31–6–5–4(c). Here, the record reveals that, pursuant to the allegations in the CHINS petition, C.M. was originally re-moved from McKinney's care because she failed to properly supervise him and to provide proper medical treatment. Although McKinney later repudiated her admissions to these allegations, she presented no evidence, and the record does not reflect, that the allegations are false. As a result, the CHINS petition sufficiently established the need to remove C.M. from the home in order to adequately provide for his physical and emotional care.

Additionally, the CHINS order required McKinney to participate in C.M.'s treatment and required her to seek individual therapy. R. at 132. However, McKinney testified during the termination proceedings that she did not participate in C.M.'s treatment and did not begin therapy. R. at 146. In fact, McKinney admitted during the termination proceedings that she had failed to comply with the various requirements in the disposition order until just before the termination hearing. R. at 152.

Further, the record reveals that McKinney often failed to participate in visitation with C.M. During the last part of 1994, the OFC scheduled between twenty-one and twenty-seven visits for McKinney and C.M., but McKinney failed to appear or canceled at least one-half of the scheduled visits. R. at 142, 227. McKinney admitted during the termination hearing that she had not visited with C.M. since the end of 1994. R. at 143.

The OFC also presented other evidence to show that the conditions which resulted in C.M.'s removal from McKinney's home would not be remedied. For example, Cheri Slover, the OFC caseworker for C.M., testified that McKinney had made no progress after two years of counseling and had failed to work towards reunification with C.M. R. at 259. Slover also indicated that the visits McKinney failed to attend were emotionally devastating to C.M. and that McKinney exhibited inappropriate behavior during the visits that she did attend. R. at 225, 252–54. At one point, Slover stated that the OFC informed McKinney that her visitation would be suspended until she sought therapy.

Finally, McKinney admitted during the hearing that her older son, N.M., had lost credit for school due to unexcused absences

and that he been removed from her home. R. at 135–37. McKinney also testified that she had helped N.M. run away from a juvenile facility and made him accompany her when she committed the crime of residential entry, a class D felony. R. at 139.

When considered as a whole, this evidence is sufficient to demonstrate a reasonable probability that the conditions which resulted in C.M.'s removal from McKinney's home would not be remedied or that the continuation of the parent-child relationship posed a threat to C.M.'s well-being. As previously mentioned, the trial court did not have to wait until C.M. was irreversibly harmed such that his physical, mental, and social development was permanently impaired before terminating McKinney's parental rights. *See J.L.L.*, 628 N.E.2d at 1227. Although McKinney argues that she had started to comply with the dispositional order shortly before the termination hearing, it was within the province of the trial court, as the finder of fact, to ignore or discredit this evidence. As previously stated, we will not reweigh the evidence on appeal. Under these circumstances, we cannot say that the trial court erred in determining that the second statutory element for termination was met.

### C.   Best Interests of Child

■ The third statutory element that must be established by the OFC is that termination is in the child's best interests. I.C. § 31–6–5–4(c). Rose Pfifer, C.M.'s counselor with the foster placement agency, testified that it was in C.M.'s best interest to terminate the parent-child relationship. R. at 94. She stated that termination was necessary to enable C.M. to "move forward in ... [his] social and emotional development. And he can only do that in a whole new environment." R. at 94. Pfifer further testified that C.M.'s condition had improved and that he had become more independent since he was placed in foster care. R. at 95. He was more at ease talking about what has happened to him and had learned to do his own catheterization. R. at 95.

In addition, Melissa Utterback, C.M.'s foster care case manager, testified that C.M.'s physical condition had improved significantly since being placed in foster care and would continue to improve with more therapy. R. at 103–4. Since being placed in foster care, C.M. had learned to maneuver with a walker and his range of motion and overall stamina had greatly improved. Additionally, Utterback stated that C.M. was doing well in his classes and that he got along well with his foster family. R. at 105. Utterback maintained that permanency was an essential part of C.M.'s continued emotional growth and that extended foster care would be detrimental to him. R. at 110.

Finally, Slover, the OFC caseworker, and Herman Holtsclaw, the court-appointed special advocate, testified that terminating McKinney's parental rights was in C.M.'s best interest. R. at 121, 292. Under these circumstances, we conclude that the evidence was sufficient to satisfy the State's burden of proving that termination is in C.M.'s best interest.

### D.   Plan for Care and Treatment of Child

The final statutory element that the OFC must establish is that there is a satisfactory plan for the care and treatment of the child. I.C. § 31–6–5–4(c). Slover testified that the OFC had proposed adoption for C.M. and that waiting another two or three years would negatively affect his probability of moving on to a successful life. R. at 260–61. Further, Pfifer and Utterback testified that C.M. wanted to be adopted into a "forever family" and that C.M. was very happy with his current foster family. R. at 94, 104. This evidence sufficiently demonstrates that the OFC had a satisfactory plan to care for C.M.

In sum, we conclude that the OFC proved the statutory elements by clear and convincing evidence. *See* I.C. § 31–6–5–4(c). Accordingly, the judgment terminating McKinney's parental rights with respect to C.M. was not clearly erroneous.

Judgment affirmed.

RUCKER, J., concurs.

SHARPNACK, C.J., concurs with separate opinion.

SHARPNACK, Chief Judge, concurring.

Although I agree with the majority's conclusion that the evidence was sufficient to support the termination, I respectfully disagree with the majority's resolution of the collateral estoppel issue. The majority declines to apply the rationale in *Adams*, 659 N.E.2d at 202, on the basis that *Adams* failed to consider the "party's incentive and ability to litigate the prior action, including the interest at stake for the party in the previous proceeding and how the party perceived this interest" as required by *Tofany*, 616 N.E.2d at 1038. From this characterization of *Adams*, the majority then concludes that the party's incentive to litigate a CHINS proceeding is different from the incentive to litigate a termination proceeding. As a result, the majority holds that the principles of collateral estoppel did not preclude McKinney from challenging her admissions to the allegations in the CHINS petition during the termination hearing.

First, I do not agree that the parent's interest in litigating a CHINS petition differs significantly from the parent's interest in preventing the termination of parental rights. In both a successful CHINS and a successful termination proceeding, the ultimate determination by the trial court is essentially that the parent is not properly caring for the child. Once this determination is made, intervention by a third party is required to ensure the child's welfare. A parent would not want to have this type of determination made by a trial court, even at the CHINS level, because a third party would then interfere with the parent's relationship with the child. A CHINS finding could have far-reaching consequences in other aspects of the parent/child relationship.

Furthermore, the full litigation of the issue of neglect at the CHINS stage is essential to identifying and providing the appropriate services to protect the welfare of the child. The accurate assessment of a parent's deficiencies and a child's needs is critical to helping the family improve the child's care and to preventing future incidents which could lead to further CHINS proceedings or a termination proceeding. With this in mind, a parent should be encouraged to take the CHINS proceeding seriously and should understand that a CHINS determination has serious consequences. Only when the parent understands the consequences of the proceedings will the parent be motivated to improve the child's care so that further intervention by the OFC will not be needed. By eliminating the preclusive effect of a CHINS determination, we would be sending a message to parents that it is acceptable to admit to the allegations in a CHINS petition merely to simplify the CHINS process because they can always challenge the admission later if they need to. This message minimizes the importance of a CHINS proceeding.

Further, I do not agree that the parent's motivations in the two proceedings differ because the parent could choose not to fully litigate the issues in the CHINS petition so that the child could receive government services. The number and type of services offered to the child and parent is ultimately within the trial court's discretion when the child is declared a CHINS. Therefore, the availability of services for the child and parent is neither directly nor primarily dependent upon the parent's choice to litigate or to admit to the allegation of neglect. In other words, a parent who chooses to litigate the issue of neglect is not later precluded from receiving services to improve his or her parenting ability after the finding that the child is a CHINS, and the trial court would not withhold services to the child on the basis that the parent litigated the issue of neglect rather than admitting to the charge.

Finally, I disagree with the majority's statement that the application of collateral estoppel in this situation would not serve the interests of judicial economy. While the application of collateral estoppel to termination proceedings might have the indirect effect of causing CHINS proceedings to become more thorough, the CHINS proceeding is the only appropriate stage to litigate the issues raised in the CHINS petition. When the CHINS petition is filed, witnesses, evidence, and records are more readily available than they would be perhaps years later at a termination proceeding. As a result, the evidence before the trial court concerning the CHINS allegations would naturally be more accurate

and accessible than it would be at a termination proceeding. In addition, relitigating CHINS determinations during a termination proceeding would complicate and confuse the ultimate issue before the trial court, which is whether the OFC satisfied the statutory requirements for terminating parental rights. Allowing the parent to relitigate the CHINS determinations would also cause undue hardship on the OFC to reproduce witnesses and evidence for incidents that potentially took place years earlier, even though the OFC had already met its burden with respect to the CHINS allegations during the CHINS proceedings. Therefore, relitigating issues which have been previously determined by the trial court does not serve the interest of judicial economy.

With these thoughts, I would have found that McKinney was collaterally estopped from challenging her admissions to the CHINS allegation. However, because the majority concluded that even had the issue been relitigated, the evidence is sufficient to support the termination, I fully concur in the result.