**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 29 2014, 9:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of C.W., minor child, and L.W., Mother, | ) ) ) ) | |
| L.W., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 79A04-1310-JT-510 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Faith A. Graham, Judge
Cause No. 79D03-1308-JT-53

**April 29, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

L.W. ("Mother")[1] appeals from the juvenile court's order terminating her parental rights to C.W. ("the Child"), contending that her due process rights were violated by the methodology used to establish the allegations of the petition, and that the evidence supporting the termination of her parental rights was insufficient.

We affirm.

## FACTS AND PROCEDURAL HISTORY[2]

The facts most favorable to the juvenile court's decision reveal that Mother has had a history of instability in her life. Mother's father, who has been in prison since 2007, was an alcoholic and physically abused Mother's mother. Mother was molested by an uncle when she was seven years old. She has not been employed since 2005 and, before her incarceration, was receiving public assistance benefits.

Mother was involved in child in need of services ("CHINS") cases with respect to her six other children ("the first CHINS case"). The first CHINS case arose due to, among other things, serious, unexplained injuries to one of her children ultimately resulting in Mother's incarceration. In the first CHINS case involving the Child's older siblings, only the twins were the children of Father. In total, Mother had seven children by five different

---

[1] C.Q. ("Father"), the biological father of the Child, voluntarily terminated his parental rights to the Child and does not participate in this appeal. We will recite facts pertinent to Mother's appeal. Father was also the biological father of a set of twins, who were two of the Child's six siblings. Father's parental rights to the twins were terminated in a former CHINS proceeding.

[2] The record on appeal in this case was prepared pursuant to the Indiana Supreme Court's "Order Establishing the Indiana Court Reporting Pilot Project for Exploring the Use of an Audio/Visual Record on Appeal [,]" issued on September 18, 2012, and effective on July 1, 2012. *See In Re Pilot Project For Audio/Visual Recordings In Lieu of Paper Transcripts In the Preparation of the Record and Briefing on Appeal*, 976 N.E.2d 1218 (Ind. 2012). We are grateful for the cooperation of the Honorable Faith H. Graham of Tippecanoe Superior Court, appellant's counsel, and the Office of the Indiana Attorney General in the execution of this pilot project. Because there is no paper transcript, our citations reflect the location of the information on the DVD.

men, several of whom were described as being abusive or involved with illegal drug activity. The first CHINS case was based on allegations of lack of supervision, physical abuse, and medical neglect. The Tippecanoe County Child Protective Services ("TCCPS") received a report that Mother had left her two-month-old twins home alone. Because of the support offered to Mother by family members, however, this report was unsubstantiated, and no services were offered to Mother at that time.

On December 7, 2011, the TCCPS received a second report alleging that one of the twins, C.L.Q, arrived at the emergency room with swelling on his face, for which Mother had no explanation. Mother had provided inconsistent information about C.L.Q.'s caregivers and the onset of his injury. The first CHINS case was then filed.

In concluding that the Child's older siblings were CHINS, the juvenile court found that the six-month-old child, C.L.Q., had suffered non-accidental trauma consisting of acute soft tissue injuries to the face, extensive acute skull fractures, and intracranial hemorrhages with associated brain injuries. Those injuries to C.L.Q. were consistent with abusive head trauma consisting of compression forces or crush injury and were equivalent to injuries observed in children run over by motor vehicles. As a result of C.L.Q.'s injuries, he suffered from seizure disorder, blood loss anemia, right-sided paresis, with other motor function difficulties, as well as ongoing health and developmental risks.

Mother stated that she had noticed C.L.Q.'s symptoms, described as a big head and shaking arms and legs, but failed to seek immediate medical attention. Mother was the only caregiver at the time, but could not provide a reasonable explanation for the injuries. The injuries suffered by C.L.Q. were made worse by Mother's delay in seeking medical attention.

Mother admitted to leaving the twins home alone while she went shopping, claiming that it was easier and quicker for her than if she had taken them along. Mother failed to properly supervise her children, allowing the infant twins to fall out of bed on more than one occasion, and had left the twins home alone on more than one occasion.

Mother also admitted to having a sexual encounter with Father on December 6, 2011, while one of her children was on the same mattress. Mother believed that Father may have harmed that child. Nevertheless, Mother maintained a relationship with Father and became pregnant with the Child.

Mother's home lacked adequate food and furnishings, and at the time of her children's removal, there was only one gallon of milk in the home. Father had not had substantial contact with his children and had not provided financial support. Pursuant to a CHINS detention hearing order issued on December 9, 2011, Mother's older children were placed in protective custody.

Mother was offered services through the first CHINS case, but failed to make any progress toward stability or improved parenting. After a year of participation in services offered to her, Mother's visitation with her older children remained fully supervised and occurred only one time per week. Mother was rarely prepared for visits.

As a result of the injuries to C.L.Q., Mother was charged on November 1, 2012, with neglect of a dependent resulting in serious bodily injury, as a Class B felony. Mother pleaded guilty to that charge on April 24, 2013. Conviction was entered on May 31, 2013, and Mother was sentenced to incarceration for ten years, with seven years executed—four at the Department of Correction and three on Community Corrections—followed by three

years of supervised probation. At sentencing, the trial court found Mother's lack of remorse and the extensive injuries to the child as aggravating circumstances.

One of the Child's siblings was reunited with his father, and the CHINS proceedings with respect to that child were dismissed. Mother's parental rights to the other children were terminated on July 26, 2013. The Child was born on November 20, 2012, while Mother was incarcerated at the Tippecanoe County Jail on charges of neglect of a dependent causing serious bodily injury with respect to C.L.Q. Mother reported that the Child's biological father could be one of several men. Mother had received an eviction notice effective December 16, 2012. Her bond was set at $12,500 surety, which Mother was unable to produce.

The Tippecanoe County Department of Child Services ("TCDCS") filed the CHINS petition ("the second CHINS case") pertaining to the Child on November 26, 2012. The Child was placed in protective custody on that same date, and a court appointed special advocate ("CASA") was assigned to represent the best interests of the Child. The juvenile court found the Child to be a CHINS, and the dispositional order was entered on February 13, 2013. The Child has been out of Mother's and Father's care continuously since then.

Mother was unable to participate in services due to her incarceration and did not have a plan for the care of the Child during her incarceration. Mother was unable to provide for the Child's daily needs, and the Child was not able to stay at the jail with Mother. The Child was placed with his maternal grandmother on November 26, 2012.

The CASA has visited Mother at least once per month during Mother's incarceration. The CASA observed that the main concerns Mother expressed were that

5

no one in her family had helped her to get out of jail, that incarceration was difficult for her, and that she did not know what would happen to the possessions she had at her apartment. Mother would occasionally ask about the children, but would then focus on herself again. The CASA noted that prior to Mother's incarceration, she did not have other responsibilities, but could not provide meals consistently for the children on even a once-a-week basis. Mother showed no emotional attachment to her children and placed her own needs before those of her children. The CASA believed that Mother could not provide for her children's needs when she could not take care of herself and that the children's lives had been unstable for long enough. The CASA recommended the termination of Mother's parental rights to the Child and a plan for the Child's adoption by the maternal grandmother.

The evidentiary hearing on the termination petition was held on September 30, 2013. At the hearing, TCDCS exhibits 1 through 6 were admitted without objection. Exhibit 1 was the initial CHINS documents in the second CHINS case, and Exhibit 2 was the court orders from the second CHINS case. Exhibit 3 was the order to terminate Mother's parental rights to the Child's six other siblings. The TCDCS reports from the second CHINS case were included in Exhibit 4. Exhibit 5 was the CHINS fact-finding order from the first CHINS case. The chronological case summary from Mother's criminal case was admitted as Exhibit 6. The CASA tendered its Exhibit 1, the CASA reports from the first CHINS case, and Exhibit 2, the CASA reports in the second CHINS case, and both were admitted without objection.

After the discussion concerning the admission of exhibits, counsel for TCDCS and Mother discussed whether the juvenile court should take judicial notice and incorporate

6

the record from the prior termination proceedings, or simply request the application of the doctrine of collateral estoppel using the recent termination order for the Child's older siblings. Mother's counsel stated that he was "under the impression that [TCDCS] was going to ask to admit the trial testimony from the previous TPR; in part for expediency, and in part so we might be able to consolidate two appeals if the court rules in favor of [TCDCS]. . . ." (A/V Rec. No. 1; 09/30/13; 1:58:19-1:58:46). Mother's counsel stated that, "The whole point was not to have to put on a whole other day of testimony . . . ." (A/V Rec. No. 1; 09/30/13; 2:02:07-2:02-12). Ultimately, counsel for TCDCS sought the application of collateral estoppel in this termination hearing and requested that the juvenile court's prior termination adjudication order, or TCDCS Exhibit 3, which had previously been admitted in evidence without objection, be considered in support of that argument. Mother's counsel, after noting that the record would be devoid of actual testimony, stated, "we have no problem with that." (A/V Rec. No. 1; 09/30/13; 2:02:19-2:02:24). Because TCDCS Exhibit 3 had already been admitted in evidence, the juvenile court noted that TCDCS was withdrawing its motion to incorporate the underlying trial transcript into evidence.

The evidence presented at the termination hearing demonstrated that conditions had not changed. Mother's counsel asked Mother what she wanted to tell the juvenile court on the subject of the termination of her parental rights to the Child. Mother stated, "I don't think that's fair because, like I said, I'm here for something I didn't even do." (A/V Rec. No. 1; 09/30/13; 2:50:48-2:50:59). Additionally, she stated, "I had seven kids total and how could I do that [when I'm the one who] took him to the hospital?" (A/V Rec. No. 1; 09/30/13; 2:51:03-2:51:10). Father testified at the hearing and stated that he had not seen

7

any change or improvement on Mother's part with respect to providing food and clean clothing for the children since he had known her.

The juvenile court took the matter under advisement and, on October 8, 2013, issued its order finding that TCDCS had met its burden of proving by clear and convincing evidence all of the required elements in the termination petition. Mother now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights to the Child, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d

8

98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

    (B)    that one (1) of the following is true:

        (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

        (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

        (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

    (C)    that termination is in the best interests of the child; and

    (D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds

that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis supplied).

Mother argues that her due process rights were violated because TCDCS "elected to proceed under the theory of collateral estoppel, suggesting that since mother had just suffered a TPR judgment about 60 days earlier, that she was estopped from litigating this petition, based on the theory that the same facts would be advocated to prosecute the instant petition." *Appellant's Br.* at 8-9. TCDCS contends that Mother's argument has been waived for appellate review, and that the error, if any, was invited by Mother.

The State correctly observes that Mother is raising this argument for the first time on appeal. It is well settled that a party may not raise an issue for the first time on appeal. *Smith v. Marion Cnty. Dep't of Pub. Welfare*, 635 N.E.2d 1144, 1146 (Ind. Ct. App. 1994). Furthermore, "[i]t is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal." *Hite v. Vanderburgh Cnty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006). A party waives a claim alleging a violation of due process when it is raised for the first time on appeal. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2003). Because Mother failed to object at the hearing, her claim, raised for the first time on appeal, is waived.

Additionally, Mother's counsel agreed to the procedure used at the hearing, thus inviting the error of which she now seeks to take advantage. Our Supreme Court stated the following in *Witte v. Mundy ex rel. Mundy*, 820 N.E.2d 128 (Ind. 2005): "The doctrine of invited error is grounded in estoppel. Under this doctrine, 'a party may not take

10

advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct.'" *Id*. at 133 (internal citations omitted). Both counsel for TCDCS and Mother discussed their desire to avoid having to duplicate testimony that had already been presented and preserved in the first termination case, as such would be used to support the termination petition involving the Child. Counsel for Mother expressed the preference that if the transcript from the prior termination proceeding were introduced, that TCDCS should be the party to sponsor the exhibit. Counsel for Mother also expressed his understanding that introduction of the transcript would be more expedient and would aid in the preparation of appellate briefs in the event both termination decisions would be appealed. That option was abandoned in favor of TCDCS relying solely on Exhibit 3 in support of its collateral-estoppel argument. To this proposal, counsel for Mother stated, "We have no problem with that." *(A/V Rec. No. 1; 09/30/13; 2:02:19-2:02:24)*. Thus, any error in the trial court's application of the collateral estoppel doctrine in this termination proceeding was the natural result of the error, if any, invited by Mother. We will not review invited error. *In re A.D.*, 737 N.E.2d 1214, 1217 (Ind. Ct. App. 2000).

Moreover, when TCDCS offered into evidence Exhibits 1 through 6 they were admitted with no objection from Mother. When the method of usage of the prior transcript and evidence from the prior termination proceeding was discussed, the juvenile court noted that those exhibits, which included Exhibit 3—the order from the prior termination proceeding—were already admitted in the present termination case. As such, those exhibits could form the basis for the juvenile court's decision in the present case.

Indiana Evidence Rule 103 requires that a party claiming error in the admission or exclusion of evidence may do so only if the error affects a substantial right of the party and

the party timely objects to the evidence and states the specific grounds for the objection.[3] "'In failing to make a timely objection or motion, the party is, in effect, acquiescing in the admission of the evidence.'" *Everage v. N. Ind. Pub. Serv. Co.*, 825 N.E.2d 947, 948 (Ind. Ct. App. 2005) (quoting *Reed v. Dillon*, 566 N.E.2d 585, 588 (Ind. Ct. App. 1991)).

Our review of a trial court's admission or exclusion of evidence is for an abuse of discretion. *In re Des.B.*, 2 N.E.3d 828, 834 (Ind. Ct. App. 2014). A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it. *Id*. Errors in the admission of evidence are disregarded as harmless, unless they affect the substantial rights of a party. *Id*. We assess the probable impact of the evidence upon the finder of fact in making our determination whether the admission of evidence affected a party's substantial rights. *Id*. Further, reversible error cannot be based on the erroneous admission of evidence that is merely cumulative of other evidence that has already been properly admitted. *Id*.

Mother waived her claim by failing to object to TCDCS's exhibits. Indeed, Mother stated that she had no objection to them. Thus, the juvenile court did not abuse its discretion in the admission of the exhibits and did not abuse its discretion by relying on them.

The State claims that the doctrine of collateral estoppel did not play a large role in the juvenile court's determination in this case, as the admission of the prior CHINS orders and prior termination order were sufficient to support the juvenile court's determination,

---

[3] The fundamental error doctrine is an exception to the general rule that the failure to object at trial constitutes a procedural default precluding consideration of an issue on appeal. *Benson v. State*, 762 N.E.2d 748, 755 (Ind. 2002). Mother has not advanced that argument however.

12

but addresses Mother's argument nonetheless. We have considered the use of collateral estoppel in termination proceedings, stating the following:

> Collateral estoppel operates to bar relitigation of an issue which was necessarily adjudicated in a former suit. Where a party seeks to relitigate an issue, the first adjudication is conclusive even if the second action is on a different claim.

> In determining whether to apply the doctrine of collateral estoppel, Indiana courts have traditionally examined whether the party seeking estoppel established the following elements: (1) a final judgment in a former suit on the merits in a court of competent jurisdiction; (2) an identity of issues; and (3) the party to be estopped was a party in the prior action or in privity with that party. However, the primary consideration in determining the appropriateness of allowing a party to assert collateral estoppel is whether the party against whom the judgment is pled had a full and fair opportunity to litigate the issue in a previous action and whether it would be otherwise unfair under the circumstances of the particular case to apply collateral estoppel. To make this determination, our courts consider the party's incentive and ability to litigate the prior action, including the interest at stake for the party in the previous proceeding and how the party perceived this interest.

*In re C.M. v. Greene Cnty. Office of Family & Children*, 675 N.E.2d 1134, 1137 (Ind. Ct. App. 1997) (internal citations omitted).

Here, TCDCS was invoking offensive collateral estoppel against Mother. "Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose the defendant from litigating an issue that the defendant has previously litigated unsuccessfully in an action with another party." *Adams v. Marion Cnty. Office of Family & Children*, 659 N.E.2d 202, 205 (Ind. Ct. App. 1995). In the present case, however, Mother was not prevented from presenting evidence. Mother's parental rights to the Child's older siblings were terminated approximately two months prior to the adjudication at issue here. The State correctly observes that Mother does not claim she was did not have a full and fair opportunity to litigate the issue in the prior termination proceeding. Indeed, Mother

13

acknowledges that she was motivated to defend against the termination of her parental rights in the prior termination proceeding. We agree that the issue in both cases was the same—whether Mother was able to safely and properly care for her children.

Further, application of offensive collateral estoppel in this situation is not unfair. The record reveals that conditions had not changed. Mother remained incarcerated for her conviction of neglect of a dependent and would remain incarcerated until at least the end of 2014. Additionally, Mother joined in the effort to find a means for admitting the trial testimony from the previous termination proceeding in part to aid in the consolidation of the two appeals in the event the juvenile court ruled in favor of TCDCS on the present case. Thus, if the juvenile court had prevented Mother from presenting evidence on her fitness to parent the Child, by way of application of collateral estoppel, the juvenile court would not have erred. For all of the reasons set forth above, we conclude that Mother's due process rights were not violated by the methodology used to establish the allegations of the petition.

We now consider Mother's sufficiency claim regarding the evidence used to support the juvenile court's determination that her parental rights should be terminated. Although Mother has arguably waived her argument on this matter by failing to support her position with legal authority, we will nonetheless address the merits of her claim. Mother contends that the prior order terminating her parental rights to the Child's older siblings is not evidence; therefore, the facts found by the juvenile court are not supported by sufficient evidence. More particularly, Mother challenges the trial court's conclusions that there was a reasonable probability that the conditions that resulted in the Child's removal and

continued placement outside the home would not be remedied, and that the continuation of the parent-child relationship posed a threat to the Child's well-being.

When a juvenile court decides the issue whether the conditions that led to the Child's removal would be remedied, the juvenile court must assess a parent's fitness to care for his or her child at the time of the termination hearing. *In re D.D. v. Marion Cnty. Office of Family & Children*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004). Parental rights may be terminated when parties are unwilling or unable to meet their parental responsibilities. *Id.* at 265. The evidence reflects that Mother remained incarcerated at the time of the termination hearing and was expected to remain incarcerated through most of 2014. Mother had a history of unstable relationships with men who were abusive and/or involved in illegal drugs. Mother's seven children were fathered by five different men, and Mother admitted to having a sexual encounter with Father while one of her children was on the same mattress. Mother believed that Father may have harmed one of her children.

The record demonstrates that Mother did not appear to understand her parental responsibilities. She admitted to leaving her infant twins home alone while she went shopping because it made the task quicker and easier. Mother's home lacked adequate food and furnishings. When the children were removed from Mother's home, there was only one gallon of milk in the home. Mother was offered services as part of the first CHINS case. Mother participated in a psychological evaluation and was diagnosed with Borderline Intellectual Functioning. Mother lacked motivation to accomplish the goals set for her and focused on matters other than her children. Mother failed to make any progress toward stability or improvements in her parenting skills. A year after the first CHINS case was

filed, Mother's visitation with the Child's older siblings remained fully supervised and occurred only one time per week. Mother was rarely prepared for those visits.

The juvenile court's conclusion is supported by sufficient evidence. The TCDCS exhibits, which were admitted without objection, the CASA exhibits, and the testimony produced at the evidentiary hearing all support this conclusion. We find no error here.

The juvenile court also found that there was a reasonable probability that continuation of the parent-child relationship posed a threat to the Child's well-being. A juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that the child's physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re E.S. v. Miami Cnty. Div. of Family & Children*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). "When the evidence shows that the emotional and physical development of the child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id*.

The evidence set forth in our analysis of changed conditions, likewise supports the juvenile court's conclusion with respect to our analysis of the child's well-being. *See In re A.K. v Ind. Dep't of Child Servs., St. Joseph Cnty.*, 924 N.E.2d 212, 221 (Ind. Ct. App. 2010) (evidence supporting threat-to-well-being conclusion also supports child's-best-interests conclusion). The Child's older sibling was seriously injured, and Mother's delay in seeking treatment exacerbated the effects of those injuries. Mother's lack of empathy toward that child supports the conclusion that the continuation of the parent-child relationship posed a threat to the Child's well-being. We have held that evidence that a parent with low intellectual capacity displayed a continuing lack of stability, neglect of her children's medical needs, and lack of progress in services demonstrated a sufficient threat

to the well-being of the children such that termination of parental rights was warranted. *In re A.S. v. Tippecanoe Cnty. Dep't of Child Servs.*, 905 N.E.2d 47, 50 (Ind. Ct. App. 2009). The juvenile court's conclusion was supported by sufficient evidence.

In sum, Mother's due process rights were not violated by the method used to admit evidence from a prior termination proceeding. The exhibits and testimony presented at the termination hearing, a hearing at which Mother participated telephonically, was sufficient to support the juvenile court's conclusions. The juvenile court's termination of Mother's parental rights to the Child was not clearly erroneous.

Affirmed.

MAY, J., and BRADFORD, J., concur.