**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Sep 12 2013, 6:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GRACE M. BAUMGARTNER**
Indiana Department of Child Services
Bluffton, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF El.S. and Et.S. (Minor Children) and | ) ) ) ) |
| M.S. (Mother), | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 90A05-1211-JT-614 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE WELLS CIRCUIT COURT
The Honorable Kenton W. Kiracofe, Judge
Cause Nos. 90C01-1203-JT-1 and 90C01-1203-JT-2

**September 12, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

M.S. ("Mother") appeals the trial court's termination of her parental rights to her children, El.S. and Et.S. We affirm.

**Facts and Procedural History**

In its termination order, dated November 16, 2012, the trial court made the following relevant findings and conclusions:[1]

**FINDINGS OF FACT**

1. El.S. has a date of birth of July 24, 2008.

2. Et.S. has a date of birth of July 24, 2008.

3. The alleged father of El.S. and Et.S. is [R.H.].

4. Mother is the mother of El.S. and Et.S.

5. On March 11, 2010 Et.S. and El.S. were found in the street by officers of the Bluffton Police Department with other small children, alone and unattended.

6. On March 11, 2010 El.S. was examined by a physician and was found to have 6 human bite marks on his body.

7. Both El.S. and Et.S. were dirty and unkempt on March 11, 2010.

8. Et.S. and El.S. were detained by the Indiana Department of Child Services [("DCS")], on March 11, 2010.

9. On May 5, 2010 a fact-finding hearing was held on the [DCS's] petition alleging that Et.S. and El.S. were Children in Need of Services.

10. The Court found that El.S. and Et.S. were Children in Need of Services for the reason that the children's physical or mental condition was

---

[1] The trial court's order refers to the parties by their full names. We use "Mother," "El.S.," and "Et.S." where appropriate.

2

seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the children's parent to supply the child with necessary food, clothing, shelter, medical care, education or supervision.

11. At the [f]act-finding hearing the Court found that Mother has a substance abuse problem, evident by her testing positive for marijuana, methadone, opiates, benzodiazepines, and oxycodone. Said positive tests were taken during the time the children were in detention.

12. The Court found at the fact-finding hearing that Mother had an opportunity for ten (10) supervised visits since the detention and only attended four (4) of those visitations.

13. Following the fact-finding hearing the Court found that [DCS] had used all reasonable efforts to prevent the removal of the children and that it would be contrary to the best interest and welfare of the children to return to the children's home.

14. Responsibility for the placement care of the children remained with [DCS].

15. Dispositional hearing was held on June 16, 2010, which Mother did not attend.

16. At the dispositional hearing the Court ordered Mother to complete the following programs and services:

   a. Maintain employment and stable housing;
   b. Actively attend and participate in homemaker services through Youth Service Bureau;
   c. Actively attend and participate in substance abuse counseling through Park Center;
   d. Submit to random drug screenings administered by [DCS] or Caring About People;
   e. Attend a psychological assessment and follow all recommendations made by Dr. James Cates;
   f. Maintain consistent attendance at supervised visitation with children.

17. On June 8, 2011 the periodic case review was held.

18. The Court found:

    a. Mother's visitation had been suspended due to her not consistently attending her supervised visits. She had not seen the children since April 12, 2011.

    b. Mother had a total of sixty-nine (69) visitations with her children. Of the sixty-nine (69) visitations, she attended thirty-four (34), no-showed to fourteen (14), and canceled thirteen (13). Five (5) visitations were canceled by [DCS].

    c. Mother had a total of forty-three (43) homemaker visits scheduled. She attended seventeen (17) of those visits, no-showed six (6) times, and canceled nine (9). Six (6) visits were canceled by [DCS].

    d. Mother has been referred to three (3) different agencies for substance abuse treatment. Mother has not completed a substance abuse treatment program at any of the three (3) referred agencies.

    e. Mother has attended substance abuse treatment at Bowen Center in Huntington, Indiana. At the Bowen Center, Mother has attended eleven (11) sessions, no showed ten (10) sessions, and canceled twenty-three (23) sessions.

    f. Mother was referred to Caring About People for random drug screenings because this agency was near where she resided. She did not follow up and she was discharged from this program.

    g. Mother was referred to Dr. James Cates for a psychological assessment. She has never completed the assessment.

    h. Mother has submitted to random drug screenings for [DCS]. Mother has refused drug screens twice. Mother has tested negative eight (8) times. Mother has tested positive ten (10) times. Two (2) of the positive tests were for substances for which she had a prescription.

19. At the Periodic Case review on June 8, 2011, the Court found that [DCS] had made reasonable efforts to finalize the permanency plan.

20. On April 15, 2011 a hearing was held on [DCS's] petition requesting a suspension of visitation. The Court found that because of Mother's inconsistent visitation, apparently [sic] intoxication, and inability to properly supervise the children that continuing visitation would not be in the children's best interest.

21. On November 23, 2011 evidence was submitted to the Court on the proposed Permanency Plan filed by [DCS].

22. The Court found that Mother signed consent for the adoption of El.S. and Et.S. to [T.M.].

23. The Court ordered that the permanency plan for adoption be approved.

24. Prior to the finalization of the adoption of El.S. and Et.S., the preadoptive parent, [T.M.], chose not to pursue the adoption.

25. Wendy Garrett is a family case manager [("FCM")] with [DCS].

26. El.S. and Et.S. were detained on March 10 [sic], 2010. At the time the children were detained they were in the care of [D.R.], sister to Mother.

27. At the time of the children's detention Mother was contacted via telephone. Wendy Garrett believed Mother was intoxicated because of her slurred speech.

28. Mother refused to come and take custody of her children. The children [were] removed on March 10 [sic], 2010 and as of March 15, 2010 she had not contacted [DCS] regarding the children's detention.

29. Mother did not return to the State of Indiana because she believed she had a warrant for her arrest out of Terre Haute, Indiana.

30. At the time of the fact-finding hearing, Mother still has an outstanding arrest warrant from Terre Haute, Indiana and her license is currently suspended.

31. Valerie Runyon was a family caseworker at DCS and was assigned to El.S., Et.S. and Mother.

32. At the time of the assignment of the case, the goal was reunification.

33. Mother's former husband, [C.S.], was thought to be the father of El.S. and Et.S.; however, Mother and [C.S.'s] divorce decree specifically provides that [C.S.] is not the father.

34. [R.H.] was believed to be the putative father; however, a diligent search for [R.H.] was conducted by [FCM], Valerie Runyon and she was

unable to locate him. Service of summons by publication was attempted.

35. [R.H.] was dismissed as a party to the Children in Need of Services cases on January 10, 2012 and his parental rights were involuntarily terminated on December 21, 2011.

36. Following the dispositional order, Mother reported eight (8) different residences and at least ten (10) different telephone numbers. Several of the residences she lived in were with family members who also have substance abuse problems.

37. Mother also had sporadic employment during the period of supervision.

38. Supervised visitation in her home failed because she was evicted and failed a drug screen.

39. Mother was referred to Dr. James Cates for a psychological evaluation in March of 2010. Two (2) different appointments were made; however Mother canceled one of the appointments and failed to appear at the other.

40. [FCM] Valerie Runyon had difficulty getting Mother to a substance abuse assessment, but ultimately an assessment was conduct[ed] which recommended treatment.

41. Because of Mother's location in Fort Wayne, a referral for substance abuse treatment was made to Caring About People in May 2010. Mother never attended, despite [FCM] Valerie Runyon discussing it with her. Caring About People discharged Mother in August of 2010.

42. After moving to Huntington, Indiana, Mother requested a referral to the Bowen Center. Mother was to attend two (2) sessions per week for a total of thirty-two (32) group sessions. Mother only attended eleven (11) sessions.

43. Tim Theye was a clinical social worker and clinical addictions counselor at Bowen Center and assigned to Mother.

44. Tim Theye recommended that Mother participate in in-patient treatment. Tim Theye made arrangements for in-patient treatment but Mother failed to show.

6

45. Following the recommendation for in-patient treatment, Tim Theye recommended methadone treatment.

46. During the period of supervision, Mother tested positive for barbiturates, marijuana, vicodin, hydrocodone, and methadone, none of which she had a valid prescription for.

47. During the period of supervision, Mother was given visitation with El.S. and Et.S. to be supervised by Sherry Davis.

48. Sherry Davis works for the Youth Service Bureau of Jay County.

49. During the period of supervision, 68 visitations were scheduled between Mother and El.S. and Et.S. Of the 68 visitations, Mother failed to appear 15 times and canceled 9. Mother attended 36 visitations.

50. Mother had difficulty containing and handling the children during the visitations.

51. Mother frequently showed up lethargic and red eyed and on one occasion fell asleep.

52. Mother's mother, maternal grandmother to Et.S. and El.S., attended some of the visitations with Mother. On one occasion the maternal grandmother was asked to leave because she appeared to be impaired.

53. Forty-two (42) Home Maker visits were also scheduled by Sherry Davis with Mother. Mother attended seventeen (17) appointments, failed to appear eight (8) times and canceled 5 appointments.

54. During the one period of supervision, Mother was living with two men in the same residence. During the period of supervision, a stabbing occurred between the two men Mother was living with.

55. Sherry Davis believes that although Mother loves El.S. and Et.S. very much, a bond has not been created between El.S. and Et.S. and Mother.

56. Stephanie White is a [FCM] for [DCS] and has been assigned to Et.S. and El.S.

57. Et.S. and El.S. were placed in relative foster care placement at Mother's Aunt [A.G.] and her [fiancé T.M.].

58. At some point, [A.G.] moved out of the home and [T.M.] maintained the placement.

59. [T.M.] was willing to adopt and Mother signed a consent for adoption El.S. and Et.S. to [T.M.] [sic].

60. Ultimately [T.M.] did not proceed with the adoption.

61. El.S. and Et.S. were placed in a new preadoptive environment.

62. El.S. and Et.S. are well behaved and adjusted to their current placement.

63. In 2011, Mother became pregnant with current husband, [D.S.]. Mother obtained a prescription for and used Methadone during her pregnancy. At birth, the child tested positive for Methadone and had to be treated for methadone addiction.

64. Mother is currently prescribed Methadone.

65. Mother has not completed any of the psychological assessments.

66. During the placement, Mother has not maintained any employment.

67. Mother has been unable to remain substance free during the [] twenty-nine (29) month period [that] El.S. and Et.S. have been removed from her home.

68. Mother has not completed any of the recommended drug counseling.

69. El.S. and Et.S. have been out of the home of Mother for twenty-nine (29) months.

## CONCLUSIONS OF LAW

….

12. El.S. and Et.S. have not been placed with Mother since their detention on March 11, 2010.

13. Mother has been under a Dispositional Order since June 16, 2010.

14. Mother has demonstrated a pattern of not completing services she was ordered to participate in, including addressing her substance abuse problem and obtaining a mental health diagnosis.

15. Mother has demonstrated a pattern of inability to adequately parent her children.

16. There is a reasonable probability that because of Mother's inability to adequately meet the basic needs of her children, her pattern of not completing services she was ordered to participate in, and her continued use of controlled substances that the conditions that resulted in the children's removal from and placement outside the home have not been and will not be remedied.

17. Termination of the parent-child relationship between Mother and the children is in the best interest of the children.

18. [DCS's] plan of continuing placement, placement for adoption, and continuing counseling and medical [c]are for the children is a satisfactory plan of care and treatment for the children, El.S. and Et.S.

19. In all respects the Court finds that the allegations in [DCS's] Petition Seeking Termination of Parental Rights are true.

**THE COURT, HAVING ENTERED FINDINGS OF FACT AND CONCLUSIONS OF LAW, NOW ENTERS THE FOLLOWING JUDGMENT:**

1. The parent-child relationship between the children, El.S. and Et.S. and Mother is hereby terminated and all rights, powers, privileges, immunities, duties, and obligations, including the right to consent to adoption, pertaining to that relationship are hereby terminated.

Appellant's App. at 5-10. Mother now appeals.

**Discussion and Decision**

"The purpose of terminating parental rights is not to punish parents but to protect their

children. Although parental rights have a constitutional dimension, the law allows for their

termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:[2]

(2) The petition must allege:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

---

[2] Indiana Code Section 31-35-2-4 was amended slightly effective July 2012. We quote the version of the statute in effect when DCS filed its termination petition in March 2012.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. As a standard of proof, clear and convincing evidence requires the existence of a fact to "be highly probable." *In re D.W.*, 969 N.E.2d 89, 94 (Ind. Ct. App. 2012). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

Mother summarizes her arguments as follows:

[T]he trial court's factual findings, to the extent they are incomplete, are not supported by the evidence and do not support its conclusions that: 1) there is a reasonable probability that the conditions which resulted in the removal of the twins and justified continued placement of the children will not be remedied

11

and 2) the continuation of the parent-child relationship poses a threat to the children's well[-]being. Further, the trial court erroneously concluded termination of Mother's parental rights was in the twins' best interest and that adoption by the twins' foster parents is a satisfactory plan for the care and treatment of the twins.

Appellant's Br. at 14. Mother acknowledges that DCS was only required to prove either (1) or (2), but not both. *Id*. at 15 (citing *Bartrum v. Grant Cnty. Office of Family & Children*, 772 N.E.2d 522, 531 n.2 (Ind. Ct. App. 2002)). Because the trial court's order addresses only (1), we shall do likewise below. We now consider Mother's arguments in turn.

## I. Incomplete/Erroneous Findings

Mother first contends that findings 37 and 66 regarding her employment are "conflicting." Appellant's Br. at 17. Those findings state that Mother "had sporadic employment during the period of supervision" and that she "has not maintained any employment." Appellant's App. at 7, 8. Given that Mother had only two brief periods of employment during the pendency of this case, we cannot say that the findings are conflicting, let alone clearly erroneous.

Mother also takes issue with finding 67, in which the trial court found that she "has been unable to remain substance free during the twenty-nine (29) month period [that] El.S. and Et.S. have been removed from her home." *Id*. at 8. Mother states that she "admittedly abused pain killers and occasionally smoked marijuana from the date of removal until about 20 months prior to the termination of parental rights hearing," but claims that "the record establishes that during those last 20 months, the only opiate Mother took was Methadone and only as prescribed by her physician." *Id*. at 17-18. This claim is supported chiefly by

Mother's self-serving testimony. Mother testified that her physician tests her for drug usage, but her testimony was conflicting regarding whether those tests are random and thus less susceptible to manipulation. *Compare* Tr. at 218 ("Q. So none of your drug screens at the doctor's office has been random? A. No.") *with id.* at 262 ("They give you random tests. They use[d] to be urine samples, now they are mouth swabs."). Notably, Mother submitted no drug test results from her physician to substantiate her claims. Moreover, a random drug test conducted by DCS in late December 2011 came back negative for methadone, which suggests that she was not taking the drug in accordance with her prescription of six pills per day, i.e., she either had prematurely consumed her periodic allotment or was stockpiling pills for future use.[3]

Mother's argument also disregards the fact that her recent period of prescription methadone use came after a lengthy period of illegal drug use and repeated failures to attend court-ordered substance abuse, psychological counseling, and random drug screens. Mother essentially substituted a legal controlled substance for illegal controlled substances without addressing the underlying issues for her substance abuse. Thus, contrary to Mother's assertion, concerns about her possible relapse are far from "speculative." Appellant's Reply

---

[3] Mother asserts that the trial court "ignored [her] drug test in January 2012 which showed only her prescription dose of Methadone." Appellant's Br. at 21 (citing Tr. at 227-28 and Mother's Ex. B). The cited testimony and exhibit do not specifically mention a January 2012 drug test, and the only such test in the record shows a negative result for methadone. *See* DCS Ex. 31 (sample collected December 30, 2011, and results reported January 11, 2012). Drug test results from earlier in 2011 show positive readings for methadone. *See id.* (sample collected August 16, 2011, showing methadone level of more than 1000 ng/mL). We note that Mother's methadone pills are doled out by her husband, not her physician.

13

Br. at 7. In sum, Mother's argument regarding finding 67 is essentially a request to reweigh evidence and reassess credibility in her favor, which we may not do.

The same may be said for Mother's criticism of other findings, including those regarding her "failure to attend all scheduled visitations, homemaker visits, and substance abuse treatment sessions; her failed drug tests; other problems with visitations; and unstable home life." Appellant's Br. at 21.[4] She complains that once she "began Methadone treatment and ended her drug abuse, [she] had no ability to comply with the services because: 1) they were unavailable to her due to the cessation of services or 2) she lacked the funds to pay for such services." *Id*. at 22. Services were stopped due to Mother's admitted noncompliance, and the record suggests that those services had been provided at no cost to her. Mother had to pay for services thereafter because she had failed to comply with them, and she was unable to pay for them because she had failed to comply with the trial court's order to maintain employment. Mother also complains that "a significant portion of the missed visitations or appointments even during [her] drug abuse was attributable to [her] lack of transportation" and that "[s]he lacked a valid driver's license." *Id*. In fact, the record indicates that Mother could have walked a short distance, taken public transportation, or been driven to many of the visitations or appointments, and she had no driver's license because she

---

[4] Mother takes issue with finding 39 regarding her failure to complete a psychological evaluation, claiming that "[t]he trial court fails to note a psychological evaluation cannot be completed while Mother is 'using substances' because the evaluation would be tainted." Appellant's Br. at 23 (citing Tr. at 120). Although FCM Stephanie White testified to this effect, Mother herself testified that she failed to complete a psychological evaluation simply because she "couldn't get a ride." Tr. at 192. In either case, Mother's reasons for failing to complete a psychological evaluation do not reflect favorably on her.

14

failed to resolve an outstanding warrant for an OWI charge.[5]  Simply put, Mother has no one but herself to blame for these predicaments.

Mother also criticizes the trial court for failing to mention "that "DCS specifically found that [she] was caring appropriately for her youngest child" and that she "had lived in the same home, which DCS specifically found adequate for [that child], for the past 20 months." *Id*. at 19, 20.  Although Mother may have achieved a modicum of stability in raising her youngest child, she failed to comply with just about every court-ordered service intended to promote such stability with respect to El.S. and Et.S.  She never maintained employment, never successfully completed substance abuse or psychological counseling, never consistently submitted to random drug screens, and never consistently visited with El.S. and Et.S.[6]  When she did attend supervised visitation, she failed to discipline the children and often would be under the influence of drugs.  Mother's repeated no-shows negatively affected El.S. and Et.S., who have bonded with their foster parents and call them "mom" and "dad." Tr. at 115.[7]  Mother is currently married to a man with a "degenerative brain disorder" and an alcohol-related criminal history, and neither Mother nor her husband is currently participating in substance abuse counseling, treatment, or support groups like

---

[5]  Mother complains that "DCS workers sometimes told [her] that they would not provide transportation for her to the visits." Appellant's Br. at 22 (citing Tr. at 210).  When asked if she knew why she had been told that, Mother replied, "Probably because I needed to be an adult and find my own ride is my guess." Tr. at 210.

[6]  Consequently, Mother's challenges to conclusions 14 and 15 regarding her "pattern of not completing services" and "pattern of inability to adequately parent her children" are not well taken.

[7]  FCM Valerie Runyon testified, "The children were having behaviors when they would go back to the home or the relative placement after expecting to see [Mother], they would act out, it just wasn't good." Tr. at 66.

Alcoholics Anonymous or Narcotics Anonymous. *Id*. at 292.[8] Mother admitted that her home has only two bedrooms and that she and her husband did not have currently have their own vehicle. *Id*. at 209. As such, Mother's stability appears tenuous, at best. In sum, Mother has failed to establish that the trial court's findings are either fatally incomplete or clearly erroneous.

## II. Remediation of Conditions That Resulted in Children's Removal

Next, Mother contends that the trial court erred in concluding that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied. This Court has said,

> When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services. Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination.

---

[8] Mother's husband testified that he had been convicted of DUI three times (most recently in 2009), battery twice (once for battering a girlfriend), and criminal confinement once. He was also stabbed by one of Mother's ex-boyfriends in December 2010, when both men were living with Mother. When asked how long he had been sober, he testified, "Sober it's hard for me to describe that. I don't drink to get drunk but I drink like maybe a six pack every three weeks." Tr. at 294.

16

*In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) (citations and quotation marks omitted). "DCS is not required to rule out all possibilities of change, but only needs to establish that there is a reasonable probability the parent's behavior will not change." *In re Ma.J.*, 972 N.E.2d 394, 402 (Ind. Ct. App. 2012).

The children were removed from Mother's care primarily because of her substance abuse and resulting neglect. She constantly changed residences, never successfully completed court-ordered substance abuse treatment or psychological counseling, never maintained employment, and never consistently attended supervised visitations or random drug screenings. The trial court suspended most services to Mother because of her lack of compliance. Mother's inconsistent visitation negatively affected the children, and they had been removed from her care for over two years at the time of the termination hearing. She was unable to obtain a driver's license because she failed to resolve an outstanding warrant for an OWI charge. Mother has purportedly transitioned from using marijuana and painkillers without a prescription to using methadone with a prescription, but she has done so without any counseling to address her underlying substance dependency.[9] Mother has relapsed several times in the past, which does not bode well for the future. Although Mother may have recently achieved a measure of stability with her young daughter, adding twin five-year-old boys to the mix would subject her "to the type of stressors – namely the responsibility of maintaining a household and raising three young and active children – that

_____

[9] For this reason alone, we are unpersuaded by Mother's reliance on *Ma.J.*, 972 N.E.2d 394, and *In re C.M.*, 960 N.E.2d 169 (Ind. Ct. App. 2011), *adhered to on reh'g*, 963 N.E.2d 528 (2012).

17

would normally trigger a desire to pursue an escape from the pressures of everyday life that drugs often provide." *K.T.K. v. Indiana Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1234 (Ind. 2013).[10]  Based on the foregoing, we cannot say that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in El.S.'s and Et.S.'s removal will not be remedied.

### III.  Termination in Children's Best Interests

Mother also contends that the trial court erred in concluding that termination is in the children's best interests.[11]  We have said that

> [i]n determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and look to the totality of the evidence.  In so doing, the trial court must subordinate the interests of the parent to those of the child.  The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship.  In addition, we have previously held that the recommendations of the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*In re I.A.*, 903 N.E.2d 146, 155 (Ind. Ct. App. 2009) (citations omitted).

The trial court's findings amply support its conclusion that termination is in the children's best interests, and both FCM White and guardian ad litem Beth Webber reached

---

[10]  Mother says that "the twins had no special needs."  Appellant's Br. at 27.  We note, however, that former foster parent T.M. testified that the twins "had been diagnosed with Fetal Alcohol Syndrome," had been on medication "[t]o control their aggression," had trouble sleeping, and had compulsive eating behaviors.  Tr. at 134.  The fact that the twins are no longer on medication and no longer have significant behavior problems is a testament to the dedication of their foster families.  Mother failed to discipline the twins during her sporadic visitations with them, which reflects unfavorably on her parenting and coping skills.

[11]  DCS erroneously claims that Mother does not challenge this conclusion.

18

the same conclusion.[12] Mother attacks the basis for Webber's opinion, but this is merely an invitation to reweigh evidence and reassess credibility, which we may not do on appeal. Based on the foregoing, in addition to the clear and convincing evidence that there is a reasonable probability that the conditions resulting in the children's removal will not be remedied, we cannot say that the trial court's conclusion regarding the children's best interests is clearly erroneous.

### IV. Satisfactory Plan for Care and Treatment of Children

Mother's argument against DCS's plan for the care and treatment of the children appears to be premised solely on her argument that DCS failed to establish that there is a reasonable probability that the conditions resulting in the children's removal will not be remedied. Because the latter argument was unsuccessful, so too is the former. Accordingly, we affirm the trial court's termination order.

Affirmed.

BARNES, J., and PYLE, J., concur.

---

[12] *See* Tr. at 120 (White) ("The boys don't know who [Mother] is, like they don't know her, they don't remember her, they don't talk about her as a mother to them. Currently they are very bonded to their current pre-adoptive home and parents. I think it would be very devastating to them to be removed from that home."); *id*. at 310-11 (Webber) ("And so the difficulty is that as much as [Mother] may truly love her children, and I believe she does love her children, the substances have interfered with her ability to make good judgments with her ability to parent them appropriately, with her ability to follow through with the aspects that she needs to do to provide for them. So at this point in time I can't recommend anything but termination of parental rights. These little boys shouldn't have to put their life on hold anymore. They've been in other care than their mother's care for 29 months and they shouldn't have to wait any longer to have permanency, to know the home that they are going to be in and to be safe and protected. And so from my perspective I think it's truly in the best interest of the children that parental rights are terminated and that they be made available for adoption at this point.").